UNITED STATES, Appellee

v

MICHAEL B. CHADWELL, Private, U. S. Marine Corps, Appellant

13 USCMA 361, 32 CMR 361

No. 15,959

December 7, 1962

*Lieutenant Colonel M. G. Truesdale,* USMC, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Earl Munson,* USNR.

*Major Elvin R. Coon, Jr.,* USMC, argued the cause for Appellee, United States. With him on the brief was *Captain James W. Grant,* USN.

QUINN, Chief Judge:

On his plea of guilty to offenses subjecting him to a maximum punishment of dishonorable discharge and confinement at hard labor for fourteen years, the accused was convicted of three specifications alleging violations of Article 121, Uniform Code of Military Justice, 10 USC § 921, and two specifications of housebreaking, in violation of Article 130, Uniform Code of Military Justice, 10 USC § 930. He was sentenced to a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for two years. In accordance with assurances given to accused before trial, the convening authority modified the sentence by substituting a bad-conduct discharge for the dishonorable discharge. This sentence was affirmed by the board of review. We granted further review to consider a question relating to the legal representation accorded the accused in the pretrial proceedings.[1]

Specifically at issue is a pretrial conference arranged by defense counsel and attended by the accused, trial counsel and provost marshal investigators. The purpose of the meeting was to enable the accused "to make a clean breast of everything" of a criminal nature in which he and other persons were involved. At the conference, under questioning by defense counsel, the accused disclosed the details of his conduct in regard to the offenses charged, and the role he played in the asportation of a motor scooter. The last offense was not one of those then formally pending, but it was later added to the charge sheet. While conceding that counsel expended great effort on his behalf, the accused now contends that the call of the conference, the way in which it was conducted, and the resultant addition to the charge sheet, show that the quality of counsel's effort was so far below accepted standards as to require disapproval of the conviction and the sentence.

Limned in the abbreviated form presented above, defense counsel seems to have at least encouraged the accused to give evidence against himself. Cf. United States v Gardner, 9 USCMA 48, 25 CMR 310. However, statements submitted in connection with the appeal show that, as intended by defense counsel, the conference substantially benefited the accused. They also show that defense counsel brought to his assignment a sympathetic understanding of the accused's plight and a professional competency which helped obtain a sentence much less than the maximum for the offenses as to which the accused confessed his guilt.

Originally, the accused was charged with nineteen specifications of larceny, one specification of housebreaking on April 22, 1961, and twelve specifications of dishonorable failure to pay debts, in violation, respectively, of Articles 121, 130, and 134, Uniform Code of Military Justice, 10 USC §§ 921, 930, and 934. Two investigations under Article 32, of the Code, supra, 10 USC § 832, were held. At both, the accused was represented by the same appointed military counsel whose conduct is in issue here. During the first investigation, a number of witnesses were heard and extensively cross-examined. Also included in the evidence was an apparently voluntary statement by the accused, dated April 25, 1961, in which, among other things, he confessed that on April 17, 1961, he "took" a motor scooter from the basement of Building 421. Between the end of the first and the beginning of the second investigation, a second charge of housebreaking was laid against the accused. The new specification alleged the breaking into the dwelling of a

[1] We pass over the question whether the accused's failure to repudiate his appointed counsel, by appropriate motion at trial, precludes him from now raising the issue of inadequate representation during the pretrial proceedings, without some indication that the alleged ineffectiveness of counsel in the preliminary stage of the prosecution prejudiced the accused at trial. See United States v Winchester, 12 USCMA 74, 78, 30 CMR 74; United States v Mickel, 9 USCMA 324, 326, 26 CMR 104.

civilian on July 19, 1961. At the second investigation, held on August 11, 1961, defense counsel moved to dismiss two larceny specifications and two related bad debt specifications because of a failure of proof. He also asked for dismissal of two other larceny specifications because the witnesses had been rotated to the United States and it would be "uneconomical" to return them to Okinawa to testify against the accused. With trial counsel's concurrence, Captain Harry E. Smith, the Investigating Officer, adopted defense counsel's recommendations; but he also recommended that the remaining charges be referred to a general court-martial for trial.

On the date of the second investigation, defense counsel informed the accused he needed more information and more cooperation from him if he was to prepare properly to defend against the charges. Counsel was "certain . . . [the accused] was protecting one or more persons who were involved in all or part of the offenses"; and he believed the accused was "compounding his . . . problems" by his silence. Although the accused was, as he puts it, "interrogated at length" by defense counsel, he refused "for personal reasons" to disclose information relating to his defense or "to cooperate in a *not guilty* plea." (Emphasis supplied.) The accused insisted he wanted only to "plead guilty to the offenses as charged"; and all he wanted defense counsel to do was to "negotiate a pre-trial agreement," on the "best terms" he could get. He told his counsel he was willing to accept a sentence which included a bad-conduct discharge and confinement at hard labor for three years. On August 14, 1961, in compliance with the accused's wishes, defense counsel initiated a request for a pretrial agreement on the sentence. However, he was still troubled by the accused's adamant refusal to apprise him of the facts. Accordingly, he solicited the help of the base chaplain. The latter talked to the accused. His efforts, and "entreaties of . . . [accused's] family," convinced the accused he should cooperate with his lawyer. On August 25, 1961, he conferred with defense counsel. He told him he was now ready "to confess to all the true facts" and no longer "shield persons actually involved in some of the offenses." It was agreed that a conference would be held with trial counsel and the provost marshal investigators at which the accused would reveal the "real" facts.

Good practice surely required that defense counsel have a preliminary discussion with the accused before meeting with trial counsel and the provost marshal investigators, to screen out material not germane to the pending charges. However, there had been two pretrial investigations of the various charges and, under the circumstances, defense counsel could reasonably anticipate that accused's cooperation with the Government would lead to dismissal of some charges and a reduction in the sentence which the accused had said he was willing to accept. As a matter of fact, this is precisely what happened. After the conference, a new pretrial agreement was effected in which the convening authority agreed to approve a sentence which would not exceed confinement at hard labor for *two* years, instead of the three years of confinement originally proposed. Also, a substantial number of charges were dropped from the charge sheet, including the specification alleging the unlawful breaking into the dwelling of a civilian.

Of even greater significance to the issue before us is the fact that the new charge of housebreaking was not based on disclosures first made under defense counsel's questioning. As noted earlier, the matter was referred to by the accused in his confession of April 25, 1961, and was part of the evidence introduced in the first Article 32, supra, investigation. The following extract from the transcript of the conference clearly shows the offense had not been overlooked by the Government; it also suggests that the Government was still considering turning the complaint into a formal charge:

"Q. You're accused also of the theft of a Honda motor bike. Now, did you take this Honda motor bike from this room?

"A. Yes sir. It was stored in a basement, sir, the bike was.

. . . . . .

"Q. Did you plan to sell it?

"A. No, I didn't, sir.

"Q. Why did you take it?

"A. Just to use, sir.

. . . . . .

"Q. And you want us to believe that it's your statement that you, at no time, intended to do anything other than use this motor bike for your personal transportation?

"A. Yes sir.

"S SGT. UNDERWOOD: Might I intercede here, Major. I believe the fact was brought out in a statement I received from CHADWELL. You know the man Ski that rode with you on that bike? It was brought out also there was some talk at one time that you were going to sell him that motor bike?

"A. Well, that was talk only. I believe its been brought out that I didn't have nothing to say that time.

"Q. That was strictly his idea. You wanted the bike. You didn't want to sell it?

"A. Yes sir."

The record of the conference and the appellate papers justify the conclusion that defense counsel represented the accused with integrity and with a commendable desire to help the accused despite the accused's initial uncooperativeness. His efforts were beneficial to the accused; and there is no basis for reversal of the conviction.

The decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.